# EXHIBIT A

Filed in Lancaster District Court
*** EFILED ***
Case Number: D02CI260003232
Transaction ID: 0025490023
Filing Date: 08/25/2026 10:37:55 AM CDT

**IN THE DISTRICT COURT OF LANCASTER COUNTY, NEBRASKA**

BRECK C. COLLINGSWORTH; CAMERON GENERAL CONTRACTORS, INC.; RESORT LIFESTYLE COMMUNITIES, INC.; COLLINGSWORTH MANAGEMENT LLC; THE BRECK AND TRACY COLLINGSWORTH FAMILY, LLC; and THE BRECK AND TRACY COLLINGSWORTH FAMILY II, LLC,

Plaintiffs,

v.

MATTHEW M. MAUDE, individually,

Defendant.

Case No. CI26 - _____

Related Case No. CI 26-2589

**COMPLAINT AND JURY DEMAND**

Plaintiffs Breck C. Collingsworth ("Collingsworth"), Cameron General Contractors, Inc. ("CGC"), Resort Lifestyle Communities, Inc. ("RLC"), Collingsworth Management LLC ("Collingsworth Management"), The Breck and Tracy Collingsworth Family, LLC ("Collingsworth Family, LLC"), and The Breck and Tracy Collingsworth Family II, LLC ("Collingsworth Family II, LLC" and, together with Collingsworth, CGC, RLC, Collingsworth Management, and Collingsworth Family, LLC, "Plaintiffs") state and allege the following for their Complaint against Defendant Matthew M. Maude ("Maude").

**PARTIES**

1. Collingsworth is an individual who resides in Lincoln, Lancaster County, Nebraska. Collingsworth is the founder and owner of CGC, RLC, and Collingsworth Management.

2. CGC is a Nebraska corporation with its principal place of business at 7101 S 82nd Street, Lincoln, Lancaster County, Nebraska 68516.

3. RLC is a Nebraska corporation with its principal place of business in Lincoln, Lancaster County, Nebraska.

4. Collingsworth Management is a Nebraska limited liability company with its principal place of business in Lincoln, Lancaster County, Nebraska.

5. Collingsworth Family, LLC, is a Nebraska limited liability company with its principal place of business in Lincoln, Lancaster County, Nebraska.

6. Collingsworth Family II, LLC, is a Nebraska limited liability company with its principal place of business in Lincoln, Lancaster County, Nebraska.

7. Maude is an individual who resides in Lincoln, Lancaster County, Nebraska.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to the general jurisdiction of the District Court of Lancaster County, Nebraska, under Neb. Rev. Stat. § 24-302, which confers original jurisdiction upon district courts in all civil cases, and personal jurisdiction over the parties under Neb. Rev. Stat. § 25-536.

9. Venue is proper in Lancaster County, Nebraska, pursuant to Neb. Rev. Stat. § 25-403.01 because Maude resides in Lancaster County, Nebraska, and a substantial part of the events or omissions giving rise to the claims occurred in Lancaster County, Nebraska.

## INTRODUCTION

10. This action arises from the systematic betrayal of fiduciary trust by Maude, who served as Chief Financial Officer, General Counsel, and trusted advisor for Plaintiffs from 2006 to 2022. Plaintiffs placed Maude in one of the highest positions of trust, providing him access to the most sensitive financial, legal, and business information of Plaintiffs. To compensate Maude as a fiduciary, Plaintiffs paid him generous compensation and benefits and conditionally granted ownership of Restricted Units (as defined in the RUAs described below) in various retirement community companies which Collingsworth founded, all at no cost to Maude. As a result, Maude received over $20 million in distributions as well as other compensation and benefits over the years, for which he made no capital contributions.

11. Unknown to Plaintiffs, in the months surrounding Maude's departure in late 2022, Maude, among other things, secretly, systematically, and deliberately misappropriated vast quantities of confidential, proprietary, privileged, and trade secret information, documents, operational knowledge, financial templates, investor relationships, client and customer lists, investor lists and ledgers (including names, contact information, investment amounts, and account details for all investors across all Subject Entities), and business intelligence, land purchase documents, development plans, architectural plans, construction documents, operational data, financial statements, marketing materials, and electronically stored information from Plaintiffs' computer systems (collectively, "Confidential Info") to copy Plaintiffs' business model and create competing businesses to enrich himself.

12. After his departure, Maude conducted a deliberate campaign to obstruct, delay, interfere with, and attempt to derail Plaintiffs' contractual rights to buy out investors in Plaintiffs' businesses, the very rights that Maude assisted his clients (Plaintiffs) to obtain.

13. As a consequence of the foregoing, Maude has violated his fiduciary and statutory duties, unlawfully misappropriated, used and disclosed the Confidential Info, breached his contractual confidentiality and non-solicitation obligations, and wrongfully interfered with Plaintiffs' business relationships, contractual rights, and property rights.

14. Therefore, Plaintiffs bring this action asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, breach of attorney-client duties and privileges, violation of the Nebraska Trade Secrets Act (Neb. Rev. Stat. § 87-501 et seq.), violation of the federal Defend Trade Secrets Act (18 U.S.C. § 1836), violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030), conversion, tortious interference with contractual rights, tortious interference with business relationships, unjust enrichment, slander (defamation per se), and declaratory judgment. Plaintiffs seek compensatory damages; forfeiture of all Restricted Units; and refund of all distributions, dividends, wages, payments and benefits received by Maude together with interest thereon; temporary and permanent injunctive relief; return of the Confidential Info and deletion of all copies Maude and his agents have retained; disgorgement and restitution; exemplary damages; statutory damages; attorneys' fees and costs; and such other and further relief as this Court deems just and equitable.

**BACKGROUND**

15. In the mid-1990s, Collingsworth founded Resort Lifestyle Communities, Inc., and Cameron General Contractors, Inc., in Lincoln, Nebraska. Together, these entities locate, entitle, construct, and manage independent living retirement communities throughout the United States. Prior to his employment with RLC in May of 2006, Maude created and remains manager of three LLCs to solicit investors to invest in RLC communities (the "Maude Entities").

16. CGC locates, entitles, and constructs retirement community properties. RLC manages the day-to-day operations of each community after construction is complete.

17. Collingsworth Management serves as the manager of the Retirement Equity Investors entities and other retirement community limited liability companies.

18. Over the past three decades, Collingsworth has built the RLC enterprise into one of the premier independent-living retirement community operators in the nation. RLC currently develops, owns, and manages over sixty (60) independent living retirement communities comprising approximately eight thousand (8,000) units and is one of the largest owners and operators of seniors housing in the United States.

19. In connection with the development of fourteen (14) equity-funded retirement communities, Plaintiffs raised private investment capital from individual investors, with the assistance of Maude, by allowing investors to subscribe for units in one of eleven (11) entities that is either an investment entity partial owner of an operating entity or in the operating entity directly (the "Subject Entities"), depending on the community.

**MAUDE'S EMPLOYMENT AND FIDUCIARY DUTIES**

20. On or about May 1, 2006, Maude became employed by RLC and CGC as Chief Financial Officer ("CFO") and General Counsel, becoming not only counsel to Plaintiffs, but also a trusted advisor.

21. Maude served as the CFO and General Counsel for Cameron General Contractors, Inc., and Resort Lifestyle Communities, Inc., from May 1, 2006, through December 31, 2022. Maude is a licensed attorney and member of the Nebraska State Bar Association.

22. As a lawyer, Maude provided legal counsel and advice to all of the Plaintiffs regarding the matters referred to herein.

23. As CFO and General Counsel, Maude was responsible for the financial and legal operations of RLC, CGC, the Subject Entities, and the underlying retirement communities. His duties included among other things: financial oversight and reporting; legal counsel on corporate, securities, business and real estate matters; investor relations and communications; preparation, drafting, and distribution of all private placement memoranda ("PPMs"); drafting operating agreements and other corporate governance documents and agreements; and management of the entire investor relationship base. Maude was given access to Plaintiffs' Confidential Info while serving in these roles.

24. As CFO and General Counsel, Maude owed heightened fiduciary duties of loyalty, confidentiality, and care to Plaintiffs, including the duty not to misappropriate, disclose or use Plaintiffs' Confidential Info for unauthorized or adverse purposes. These duties survived the termination of his employment at RLC and CGC.

**THE OPERATING AGREEMENTS AND BUYOUT PROVISIONS**

25. Beginning in 2002, Maude solicited private investors either directly for the Subject Entities or, prior to his employment by RLC, through one or more of his investment entities. Once he joined RLC, he was identified in every PPM as the CFO and General Counsel. He drafted or supervised the drafting of every PPM and every operating agreement.

26. Each PPM predicted two potential exit strategies for investors. First, each PPM stated: "Exit Strategy. Our strategy for providing liquidity to our investors involves either a sale of our portfolio of ILCs [independent living communities] or an initial public offering through a newly formed real estate investment trust." **The PPMs further disclosed that no guarantees were made with respect to any forward-looking statements or the ultimate realization of any exit strategy.**

27. Second, and critically, each PPM and operating agreement also disclosed—in language that Maude himself drafted—that certain designated parties—Collingsworth, Collingsworth Management, and/or Collingsworth Family, LLC (collectively, the "Collingsworth Purchasers")—have the right to purchase the units owned by any member at fair market value as determined by an independent appraisal process. This buyout provision was included in every operating agreement for all eleven (11) Subject Entities.

28. The buyout at fair market value was not hidden, not ambiguous, and not an afterthought. Maude drafted this language. He reviewed it with Plaintiffs and with actual and potential investors. He knew it existed in every single agreement. Indeed, Maude included substantially similar buyout language in the operating agreement of at least one entity in which he personally managed and held an interest. The assertion—now advanced by Maude and his agents—that investors were told they would only be bought out by a "portfolio sale" is a deliberate falsehood contradicted by the very documents Maude himself drafted and asked investors to accept and sign.

**MAUDE'S RESTRICTED UNIT AGREEMENTS**

29. In addition to his compensation and benefits, Maude was compensated through approximately forty-four (44) Restricted Unit Agreements ("RUAs") conditionally granting him (at no cost to him and with no subsequent capital calls) equity interests in multiple retirement community limited liability companies, all subject to certain terms and conditions and his fiduciary duties. Through the RUAs, Maude has received distributions totaling over $20 million as well as other compensation and benefits over the years.

30. The RUAs were entered into between Maude (as "Employee") and three categories of entities: (i) the specific retirement community limited liability company in which the Restricted Units were conditionally granted (referred to in the RUAs as the "Company"); (ii) Maude's direct employer, being CGC and/or RLC (referred to in the

RUAs as the "Employer"); and (iii) the retirement community property or business managed by the Company (referred to in the RUAs as the "Retirement Community"). Plaintiffs CGC, RLC, Collingsworth Management, and certain Subject Entities are parties to and beneficiaries of the RUAs.

31. The conditional grant of Maude's Restricted Units and his compensation and benefits as a fiduciary were directly tied to and conditioned upon his faithful performance of contractual and fiduciary duties to Plaintiffs, including his duties of loyalty, confidentiality and care, both during and after his employment.

32. Each RUA (as well as his duties as an attorney) imposes confidentiality obligations on Maude. The RUAs executed in or before 2020 contain the following confidentiality provision: "Employee agrees that during the term of Employee's employment with Company, Employer or the Retirement Community and after termination of such employment, Employee shall not, directly or indirectly, disclose any of the Confidential Information to any person or entity outside Company, Employer or the Retirement Community or utilize any of the Confidential Information for any purpose, except during the course of performing Employee's duties in furtherance of Company's, Employer's or the Retirement Community's business." The RUAs executed after 2020 expressly incorporate by reference standardized "Terms and Conditions of Restricted Units" that contain substantially similar confidentiality provisions.

33. The RUAs executed in or before 2020 define "Confidential Information" as follows: "all ideas, information, and materials, tangible or intangible, not generally known to the public, relating in any manner to the business of Company, Employer, or the Retirement Community or any connected entity, its personnel (including principals, members, officers or employees), independent contractors, subcontractors, agents, clients or others with whom Company, Employer or the Retirement Community does business." Each RUA further provides: "Employee acknowledges that Confidential

Information is a valuable, special and unique asset of Company, Employer and the Retirement Community and that said businesses will be irreparably damaged if Confidential Information is disclosed to or utilized by persons or entities outside Company, Employer or the Retirement Community." The RUAs executed after 2020 incorporate by reference standardized terms containing a substantially similar definition.

34. The Confidential Info meets the RUA definition of "Confidential Information."

35. Each RUA expressly provides that violation of the confidentiality provisions triggers complete forfeiture of all Restricted Units and other benefits received or to be received, with rights inuring to the benefit of the Company, Employer, and Retirement Community. Each RUA executed in or before 2020 provides: "In the event Employee discloses Confidential Information in violation of this Agreement, all Restricted Units and other benefits due to or received by Employee hereunder shall be forfeited, and any Restricted Units and other benefits previously provided hereunder shall be fully delivered to Employer by the Escrow Agent." The RUAs executed after 2020 incorporate by reference standardized terms containing a substantially similar provision. Therefore, under the express terms of each RUA, the forfeiture remedy runs in favor of the Employer (CGC and/or RLC) and the relevant Subject Entity. Upon a violation, all of Maude's Restricted Units must be returned to the Employer, and Maude is obligated to return all benefits received (i.e., distributions) to Employer.

36. Moreover, for his breach of his fiduciary duties to Plaintiffs, Maude must forfeit his compensation, Restricted Units, distributions received throughout his tenure, and benefits received (i.e., employment compensation and the value of benefits received) to Employer.

37. The RUAs also prohibit Maude from competing by offering similar products or services to customers and clients. Specifically, Section 9.1 of each RUA executed in or before 2020 provides: "In order to protect Company, Employer and the Retirement Community against the disclosure of trade secrets and confidential information, and against the unfair loss of customers and clients, goodwill and employees of Company, Employer and the Retirement Community, Employee shall not, during the term of Employee's employment with Company, Employer or the Retirement Community and for a period of two (2) years thereafter, on Employee's account or as an employee, agent, partner or associate of any other person or entity, offer or provide, or permit or assist such other person or entity to offer or provide or solicit to offer or provide, products or services similar to those provided on behalf of Company, Employer or the Retirement Community to any customer or client of Company, Employer, or the Retirement Community with whom Employee did business and had personal contact, or any prospective customer or client with whom Employee actually discussed a business relationship and had personal contact during Employee's employment." The RUAs executed after 2020 incorporate by reference standardized terms containing a substantially similar definition.

38. Section 9.1 of the RUAs executed in or before 2020 expressly provides that violation of these non-solicitation and non-compete restrictions triggers complete forfeiture: "Should Employee violate this Non-Solicitation Agreement in this Section 9.1, all Restricted Units and other benefits otherwise due to or received by Employee pursuant to this Agreement shall be forfeited, and any Restricted Units and other benefits previously provided hereunder shall be fully refunded and delivered to Employer by the Escrow Agent. Company, Employer, and the Retirement Community may further exercise its rights against Employee or any third party, in law or in equity, in the event Employee violates this Non-Solicitation Agreement in this Section 9.1." The RUAs executed after 2020 incorporate by reference standardized terms containing a substantially similar

definition and also set forth that "Employee agrees that they will not, during the term of Employee's employment with the Company, the Company's Affiliates, the Employer or the Retirement Community and running continuously for a period of one (1) year thereafter, anywhere within the Restricted Areas, directly or indirectly, without the prior written consent of the Company, which may be withheld in the Company's sole and absolute discretion, engage or invest in, own, manage, operate, finance, control, or participate in the ownership, management, operation, financing, or control of, be employed by, be engaged as an independent contractor by, serve as an agent, officer, director or consultant to, be associated with or in any manner connected with, lend its name or any similar name to, lend its credit or render services or advice to, any Competitive Business (whether or not for compensation)."

39. Maude's obligations under the RUAs were not merely contractual covenants, but also constituted fiduciary duties owed to Plaintiffs by reason of Maude's positions as CFO, General Counsel, and trusted advisor. The Restricted Units conditionally awarded to Maude under the RUAs constituted compensation for fiduciary services, and Maude's continued entitlement to such Restricted Units and distributions thereon was conditioned upon his faithful performance of the fiduciary duties during and after his employment.

## MAUDE'S MISAPPROPRIATION OF PLAINTIFFS' CONFIDENTIAL INFORMATION TO FORM COMPETING BUSINESS

40. As early as April 2021, without the knowledge or consent of Plaintiffs, Maude, while employed as CFO and General Counsel for CGC and RLC, began systematically collecting and organizing Plaintiffs' Confidential Info in personal cloud storage with the intent to begin competing businesses and other unauthorized and adverse purposes.

41. In July 2026, Plaintiffs began to suspect Maude had committed misconduct toward Plaintiffs, so Plaintiffs delivered Maude's work laptop computer to an independent computer forensic auditor. That forensic audit revealed that Maude, without the knowledge or consent of Plaintiffs, engaged in a calculated, multi-year improper scheme to replicate Plaintiffs' proprietary business model using Plaintiffs' Confidential Info that he systematically misappropriated while serving as Plaintiffs' CFO and General Counsel.

42. As set forth below, Maude's multi-year scheme resulted in Maude forming Senior Retirement Resorts LLC, SR^2 General Contracting LLC, MateoCorp3 Inc., and related entities that were designed to mirror Plaintiffs' integrated business structure and compete against the very companies he represented and was entrusted to represent and serve.

43. Without the knowledge or consent of Plaintiffs, Maude populated a folder in his personal iCloud storage titled "Historical Retirement Community Data" and forwarded that folder to his personal email accounts. That folder contained Plaintiffs' proprietary financial materials, including credit packages, appraisals, loan terms, agreements, contracts, and source-and-use financial models at various loan-to-cost ratios for the retirement communities, which items are included in the definition of "Confidential Info."

44. Without the knowledge or consent of Plaintiffs, Maude also systematically forwarded investor-related communications and documents to his personal email accounts, which items are included in the definition of "Confidential Info."

45. Without the knowledge or consent of Plaintiffs, Maude stored and retained for himself thousands of proprietary files belonging to Plaintiffs in a folder named "SR^2" in his personal iCloud storage. These files include confidential materials that would be necessary to replicate Plaintiffs' business model, including without limitation: land purchase documents; development plans; architectural plans;

construction documents; operational data; financial statements; marketing materials; investor information; organizational documents; legal formation templates; and management contracts, which items are included in the definition of "Confidential Info." One file, named "New Retirement Community Model," is an Excel spreadsheet taking Plaintiffs' financial model and applying it to Maude's scheme to develop competitive independent living communities using the Confidential Info.

46. Without the knowledge or consent of Plaintiffs, Maude also copied and retained for himself Plaintiffs' complete internal Operations Manual—comprising thousands of files—into his "SR^2_" folder. The Operations Manual contained Plaintiffs' most sensitive Confidential Info, including among other things: job descriptions; human resources forms and policies; accounting templates and chart of accounts; sales and marketing manuals; resident handbooks; and a file titled "User Names and Passwords.doc." The underlying documents in the Operations Manual were long-standing legacy materials with original creation dates spanning from 2001 through 2019, representing nearly two decades of Plaintiffs' accumulated operational knowledge, confidential information, and trade secrets.

47. In addition to collecting and organizing the Confidential Info in personal cloud storage, Maude, during and shortly after his employment and without the knowledge or consent of Plaintiffs, drafted documentation to create businesses to use the Confidential Info, to compete with Plaintiffs and to actively pursue a real estate acquisition for competing retirement community projects.

48. Without the knowledge or consent of Plaintiffs, Maude used and copied Plaintiffs' Confidential Info in financial documents to generate financial models for his competing ventures such as the file "SREO - 12-31-2022.xlsx," which was originally created by Collingsworth.

49. Without the knowledge or consent of Plaintiffs, Maude populated and retained for himself a folder in his iCloud storage titled "DRAFT Data - Retirement" with retirement community development templates for an entity called "SR^2 Retirement Resort Prototype LLC." These templates—including a Certificate of Organization, Nebraska and Colorado Legal Opinion Letters, a Construction Contract, a Management Contract, Source & Use financial models, and a draft organizational chart—were directly based on and derived from Plaintiffs' Confidential Info. Maude unauthorizedly misappropriated, used, and disclosed Plaintiffs' Confidential Info as the foundation for his competing venture.

50. Without the knowledge or consent of Plaintiffs, Maude drafted formation documents—including an Operating Agreement and Written Consent and Resolutions—for "SR^2 General Contracting LLC," a second entity related to Senior Retirement Resorts LLC that was designed to perform the general contracting function in Maude's competing business structure, mirroring the role performed by CGC in Plaintiffs' integrated business model.

51. Without the knowledge or consent of Plaintiffs, Maude created and retained for himself documents in his iCloud-synced "Arapahoe CO Project" folder relating to a project he called "Vista Heights," including: a preliminary construction budget; a Purchase Agreement; and a Deposit Escrow Agreement. Maude used this Confidential Info to pursue a development deal outside the scope of his employment and for his personal benefit while still employed as CFO and General Counsel for CGC and RLC in conjunction with a third-party.

52. Without the knowledge or consent of Plaintiffs, Maude drafted and filed formation documents for a limited liability company to be called "Senior Retirement Resorts LLC" (also referred to as "SR2" or "SR^2"), including Articles of Organization and an Operating Agreement.

53. Without the knowledge or consent of Plaintiffs, Maude also drafted formation documents for "SR2 General Contracting LLC," a companion entity designed to perform the general contracting function in Maude's competing business—directly replicating the role that CGC performs in Plaintiffs' business model.

54. Without the knowledge or consent of Plaintiffs, Maude also filed Articles of Incorporation for a corporation called "MateoCorp3 Inc."

55. Upon information and belief, without the knowledge or consent of Plaintiffs, MateoCorp3 Inc. was intended to serve as the investment vehicle for Maude's competing retirement community business, replicating the Retirement Equity Investors entities ("REI Entities") fundraising model that Maude had administered for Plaintiffs throughout his tenure.

56. Finally, before ending his employment as CFO and General Counsel, and without the knowledge or consent of Plaintiffs, Maude also backed up and retained for himself his Outlook mailbox that was provided by Plaintiffs in his role as CFO and General Counsel for CGC and RLC to his personal iCloud Drive, which constituted more than 3.7 gigabyte of emails and documents, all of which were the Confidential Info of Plaintiffs.

57. The forensic audit further revealed that without the knowledge or consent of Plaintiffs, Maude's iCloud connection to his work computer was never severed after his departure, and post-employment Maude continued to access Plaintiffs computer systems and Confidential Info, and edited business documents—including files such as "new retirement community model.xlsx" and "prelim analysis of RLC offer"—that were adapted from Plaintiffs' Confidential Info. Moreover, some files that were synced to Maude's personal iCloud are no longer accessible on Plaintiffs' systems, meaning Maude retained thousands of copies of Plaintiffs' Confidential Info and discontinued Plaintiffs' access to them.

## MAUDE'S DISGRUNTLEMENT AND SEPARATION FROM THE COMPANIES

58. In the fall of 2022, as Maude orchestrated his multi-year scheme to replicate Plaintiffs' proprietary business model using the Confidential Info that Maude systematically misappropriated from Plaintiffs, Maude began making unreasonable and extortionate demands for additional compensation in the form of increased salary, new equity grants, and acceleration of vesting on outstanding equity gains in multiple retirement communities owned by Plaintiffs.

59. In mid-October 2022, a dispute arose between Collingsworth and Maude over Maude's demand for additional equity grants.

60. On November 1, 2022, Maude announced his retirement, effective December 31, 2022.

61. Prior to departing the companies, and without the knowledge or consent of Plaintiffs, Maude continued his efforts to systematically and deliberately misappropriate Plaintiffs' Confidential Info.

62. Without the knowledge or consent of Plaintiffs, Maude accessed, copied, and retained for himself Plaintiffs' files containing Confidential Info including Plaintiffs' investor lists for Maude's personal use and benefit and/or to the detriment of Plaintiffs.

63. Without the knowledge or consent of Plaintiffs, Maude transferred large volumes of Confidential Info from his company-issued laptop, and the companies' shared P Drive server to his personal iCloud account.

64. Without the knowledge or consent of Plaintiffs, Maude exported Confidential Info to his personal Gmail account, including confidential contact information for Plaintiffs' clients and investors.

65. During this same period, and without the knowledge or consent of Plaintiffs, Maude deleted large quantities of Confidential Info, including emails and documents, from his company laptop and from Plaintiffs' email server—which was not the standard operating procedure of Plaintiffs' business operations. Many of these deleted emails and documents contained Plaintiffs' contracts, property information, and other core company records.

66. Without the knowledge or consent of Plaintiffs, Maude also forwarded Confidential Info including company emails and documents to his personal email accounts (including at least two personal Gmail accounts) and to his wife's personal email account. This included forwarding Collingsworth's email communications to his wife's personal account (including the contentious October 2022 exchange regarding equity percentages), forwarding financial data in Excel spreadsheets to personal Gmail accounts, and exporting his entire VCF contact card to his personal Gmail account.

67. Without the knowledge or consent of Plaintiffs, Maude also connected multiple USB storage devices to his company computer, which Maude utilized to export Plaintiffs' Confidential Info for his personal use and other unauthorized purposes.

68. Maude's actions reflect a deliberate, premeditated theft of Plaintiffs' Confidential Info to be utilized to benefit himself and/or to harm Plaintiffs as reflected by Maude stating at a social gathering that he had all the information he needed to start a business to compete against Plaintiffs.

69. Maude's systematic theft of Plaintiffs' Confidential Info was not accidental. It was a calculated, premeditated act by a fiduciary who exploited his position of trust to steal the very Confidential Info he now uses to harm Plaintiffs and/or benefit himself.

70. Maude's misappropriation of Plaintiffs' Confidential Info was not merely retaliatory, but was also undertaken for the specific purposes of (i) interfering with Plaintiffs' exercise of their contractual

buyout rights, and (ii) enabling Maude to establish and operate a competing business that would directly replicate Plaintiffs' proprietary business model—the vertically integrated combination of in-house general contracting, senior retirement community ownership, and management operations that Plaintiffs have developed at great expense over three decades and that is distinctive to the Collingsworth enterprises and rarely used by competitors.

71. Maude using Plaintiffs' Confidential Info to plan, prepare, and take steps to interfere with Plaintiffs' contractual buyout rights and launch a competing business while still employed by Plaintiffs as CFO and General Counsel and thereafter constitutes: (a) a breach of Maude's fiduciary duties of loyalty, confidentiality, and care to Plaintiffs; (b) a breach of the confidentiality, non-solicitation, and non-compete provisions of the RUAs; (c) a breach of Maude's duties as Plaintiffs' attorney under the Nebraska Rules of Professional Conduct; (d) misappropriation of Plaintiffs' trade secrets in violation of the Nebraska Trade Secrets Act; (e) unauthorized access to and obtaining of Confidential Info from Plaintiffs' protected computers in violation of the Computer Fraud and Abuse Act; (f) conversion of Plaintiffs' Confidential Info; and (g) a breach of Maude's duties to his employer as an employee.

72. Plaintiffs have suffered and continue to suffer substantial harm as a result of Maude's misappropriation of Confidential Info for the purpose of establishing a competing business, including but not limited to: (a) the diminution in the value of Plaintiffs' Confidential Info through unauthorized disclosure and use; (b) the competitive harm threatened by Maude's replication of Plaintiffs' proprietary business model; (c) the mitigation costs including the costs of forensic investigation to identify the scope of Maude's misappropriation; (d) the expense of this litigation to recover the misappropriated information and to obtain injunctive relief; and (e) the continuing threat of harm from Maude's retention and potential further use or disclosure of Plaintiffs' Confidential Info.

## MAUDE'S INTERFERENCE WITH THE INVESTOR BUYOUTS

73. As explained above, Maude solicited private investors to become investors and become members of the Subject Entities.

74. Each investor in the Subject Entities was solicited with a private placement investment opportunity. Prospective investors in the REI Entities received detailed PPMs that disclosed the investment structure, the associated risks, and the material terms of the applicable Operating Agreements, including the buyout provisions and transfer restrictions.

75. Each prospective investor was also provided with copies of the applicable Operating Agreements and Subscription Agreements prior to making any investment.

76. After reviewing all documentation, each investor signed a Subscription Agreement confirming, among other things, that the investor was an "accredited investor" meeting certain wealth, income, risk tolerance, or financial sophistication criteria, and that the investor agreed to be bound by the terms of the applicable Operating Agreement as a member of the limited liability company.

77. In addition to the investors' express agreement to be bound by the Operating Agreements through their signatures on the Subscription Agreements, under the Nebraska Uniform Limited Liability Company Act, an operating agreement is binding on all members of a limited liability company. See Neb. Rev. Stat. § 21-110.

78. Accordingly, each investor became bound by the Operating Agreement, including a provision granting the Collingsworth Parties the express and absolute right to purchase members' units at any time and for any reason at fair market value—both by executing the Subscription Agreement and by operation of Nebraska law.

79. Maude was fully aware of all disclosures made in the PPMs, the terms of the Operating Agreements and the Nebraska LLC Act, and the investors' agreement to be bound by the Operating Agreement through the Subscription Agreement because Maude personally solicited investors on behalf of the Subject Entities, drafted and/or edited the PPMs, Subscription Agreements, and Operating Agreements for each offering, and distributed these documents to investors.

80. The Subject Entities' operating agreements provide that certain designated parties, the Collingsworth Purchasers, have the right to exercise, at their discretion, contractual buyout rights by purchasing members' units at fair market value as determined by independent appraisers (the "Investor Buyouts").

81. In early 2026, Collingsworth Purchasers decided to exercise their rights to the Investor Buyouts under the operating agreements to consolidate ownership of the Subject Entities—the very rights that Maude himself drafted into every operating agreement.

82. In May 2026, Collingsworth Purchasers exercised their Investor Buyouts rights by sending written notice letters to all members. Pursuant to the applicable operating agreements, the Investor Buyouts occurred as follows:

A. The notices informed each member that Collingsworth Purchasers were exercising their options to purchase the members' units at fair market value as calculated by Lutz & Company, P.C. using underlying independent property appraisals from Partner Valuation Advisors.

B. Each member was provided a period to either (a) accept the offer and receive payment at the calculated per unit value as determined by Lutz & Company, P.C., or (b) contest that valuation and trigger the three-appraiser (or,

for Maple Ridge Retirement, L.L.C. ("Maple Ridge"), a two-appraiser) process specified in the applicable operating agreement.

C. For members who contested the initial valuation, the operating agreements establish a comprehensive process for determining fair market per unit value. The operating agreements provide that if the Collingsworth Purchasers and a member cannot agree on value within a set timeframe, the fair market per unit value of the members' units shall be determined by independent appraisals. The contesting member and the Collingsworth Purchasers each select one appraiser, and, for each of the Subject Entities other than Maple Ridge, the two party-selected appraisers then jointly select a third, neutral appraiser.

D. All appraisers conduct independent appraisals of the properties and membership interests. The fair market value for all Subject Entities other than Maple Ridge is then determined by averaging the two closest of the three appraisals—a methodology designed to produce a fair and objective valuation while protecting against outlier appraisals. The fair market value for Maple Ridge is determined by averaging the two appraisals. The operating agreements further specify that when determining the fair market value, no discounts of any kind shall be taken into account, ensuring that members receive full value for their proportionate ownership interests.

E. Once the appraisal process is complete and the fair market value is set, the closing occurs. The operating agreements (other than Maple Ridge) mandate that the buyout close within twenty (20) days of the determination of the final fair market value.

83. Hundreds of minority members (representing over 60% of the total number of investments) did not contest the Collingsworth Purchasers' fair market value proposal and were bought out at that appraised value. These members accepted the offer, received their payments, and completed the buyout process.

84. Investors on average received an investment return of more than four (4) times their initial investment via profit distributions over time since their investment was made in addition to their buyout amounts described above.

85. However, a large group of minority members contested the Investor Buyouts due to the interference and misconduct by Maude and his agents set forth below.

86. Maude inserted himself into the process of the Investor Buyouts and has done everything in his power to interfere with, prevent and then undo the Investor Buyouts by using the Confidential Info and other means to contact investors, make false statements about Plaintiffs and their contractual rights and relationships, and recruit plaintiffs for litigation against Plaintiffs, in an attempt to undo the Investor Buyouts.

87. As part of this campaign, Maude falsely represented to investors that the Collingsworth Purchasers promised that investors would only be bought out through a "portfolio sale" and that the rights to Investor Buyouts would not be exercised by Collingsworth Purchasers. Maude's false statement directly conflicts with the express language of the very agreements he drafted and had investors sign.

88. Maude's interference is deliberate and calculated to prevent and/or undo the Investor Buyouts, slander Plaintiffs, and mislead and create false and contractually inconsistent beliefs in the investors.

89. To cloak his misconduct, Maude used his agents, third-party surrogates, to use the Confidential Info to mislead and then rally investors against Plaintiffs and the plain language of the governing agreements.

90. Upon information and belief, Maude misappropriated and provided the complete investor list and ledger for the Subject Entities—containing the names, contact information, and investment details of investors across eleven (11) Subject Entities—to his agents.

91. This investor list and ledger constitute "Confidential Information" as defined in the RUAs—as they contain information "not generally known to the public, relating in any manner to the business of Company"—and Maude's use and disclosure of it to his agents constitutes a flagrant violation of his various obligations. The confidential nature of the investor list and ledger are further evidenced by the operating agreements for the REI Entities, which require investors to affirmatively consent before their identity may be disclosed to other members or the public. Specifically, the operating agreements provide: "The Company shall further keep, at the Company's expense, a list of all Members including address and contact information subject to positive affirmation by the respective Members that they are willing to have their personal information be available for examination or inspection by the other Members and their duly authorized representatives upon five (5) business days advance notice; such records shall be maintained at the principal office of the Company, or at such other place as the Manager determines. In no event shall the list of Members positively affirming their willingness to appear on the Member list be available for distribution via any means except direct examination by the other Members or their duly authorized representative." Even with such affirmative consent, the investor list and ledger were maintained exclusively at company headquarters (on its computer systems) and made available only through in-person examination. The list and ledger that Maude misappropriated were internal documents containing the names of investors who had not given consent to appear on any list viewable by

other investors or those outside the companies, making them even more confidential than the affirmative-consent list contemplated by the operating agreements.

92. Using the investor list and ledger, Maude, through his agents, contacted investors; disseminated false and misleading information to investors regarding the Investor Buyouts and the governing documents of the Subject Entities; and urged the investors to oppose Plaintiffs and the Investor Buyouts. Specifically, Maude—himself and/or through his agents—falsely and fraudulently told investors that the Collingsworth Purchasers could only buy them out through a "portfolio sale" and that the buyout provision in the operating agreements was unfair, improper, or otherwise illegitimate. Those statements stand in direct contradiction to the language of the governing agreements, of which Maude had actual knowledge.

93. These representations are false. None of the Plaintiffs ever made promises to investors, unless placed in writing and signed by all parties, as mandated by the governing agreements (i.e., the PPMs, the Subscription and Operating Agreements of the Subject Entities). Those express disclosures and the rights to exercise Investor Buyouts were never amended, modified, or cancelled.

94. Upon information and belief, Maude also made oral defamatory statements to investors, falsely claiming that Collingsworth is committing fraud in soliciting investors and by the Collingsworth Purchasers exercising their buyout rights under the applicable operating agreements. Specifically, Maude falsely and fraudulently represented to investors—himself and/or through his agents—that Collingsworth promised investors he would never buy them out and that they would remain as investors in the Subject Entities until the retirement communities were bundled into portfolios and sold to private equity groups.

95. Maude's representations to investors are deliberate lies. Maude either drafted, approved, or advocated each of those buyout terms. He included them in every operating agreement for all eleven communities. He distributed the PPMs, disclosing these provisions to investors before they invested, signed and became bound to the governing agreements.

96. Indeed, prior to joining CGC as General Counsel and CFO, Maude thought so highly of these buyout provisions that he incorporated substantially similar terms into an operating agreement of one of the Maude Entities—Heathrow Wichita, LLC—a pooled-investment vehicle for a retirement project in Wichita, Kansas. Specifically, Maude amended the Heathrow Wichita, LLC operating agreement to grant himself and his then-wife, Elizabeth Maude, the right to buy out his investors using the exact same buyout terms that he has since misled investors to litigate against Plaintiffs. Maude thus fraudulently misled investors that a provision he personally drafted and advocated for in eleven separate agreements over thirteen years, disclosed to hundreds of investors, and adopted for his own personal benefit in his own investment vehicle, is somehow unfair, illegitimate and now should be ignored.

97. Maude's oral defamatory statements have damaged Plaintiffs' (and particularly Collingsworth and his affiliated companies) reputation and adversely impacted their business relationships with investors and customers. The statements accusing Plaintiffs of fraud are defamatory per se under Nebraska law because they impute to Plaintiffs the commission of a crime involving moral turpitude and tend to injure Plaintiffs in trade, business, and profession.

98. On or about June 22, 2026, an investor who had already closed on the Investor Buyouts reported to Plaintiffs that a third party (one of Maude's agents) was contacting investors to discuss the Investor Buyouts, presenting concerns with the Investor Buyouts such as the appraisal valuations and the promissory notes. The third party

claimed he was not representing any certain persons but mentioned that he "felt that he and Matt [Maude] were on the same page with regards to the Appraisals and the 5-year unsecured note."

99. The third party identified himself as an attorney and stated that he obtained the investors' names from an investor list.

100. When investors asked the third party how the third party obtained their contact information, the third party stated that he obtained the investors' names from an investor list, but refused to reveal where he obtained the list, stating "he had no obligation to reveal the source of the names."

101. This refusal to identify his source—combined with the third party's own admission to another investor that he and Maude were "on the same page"—confirms that Maude was the source of the confidential investor list.

### THE BARRY LAWSUIT

102. On July 9, 2026—one day before the scheduled closing of the Investor Buyouts—plaintiffs in a purported class action lawsuit captioned *Barry et al. v. Collingsworth et al.*, Case No. CI 26-2589, filed suit in the District Court of Lancaster County, Nebraska (the "Barry Lawsuit"). The action purports to represent over two hundred (200) investor-members of the Subject Entities.

103. The Barry Lawsuit asserts claims for accounting, declaratory judgment, breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty of loyalty, breach of fiduciary duty of care, fraudulent misrepresentation, promissory estoppel, equitable estoppel, injunctive relief, tortious interference with business expectancy, and statutory dissolution.

104. The timing and substance of the Barry Lawsuit confirm that it was brought as a direct outgrowth of, and in furtherance of, Maude's scheme to obstruct and undo the Investor Buyouts.

105. Upon information and belief, the Barry Lawsuit arose out of, and was made possible by, the Confidential Info that Maude misappropriated and used and disclosed to his agents. The Confidential Info is being utilized in prosecuting the Barry Lawsuit derived from Maude's breach of his confidentiality, contractual, legal, and fiduciary obligations.

106. The Barry Lawsuit was brought as a direct outgrowth of, and in furtherance of, Maude's scheme to obstruct and undo the Investor Buyouts. The timing of the filing—one day before the closing of the Investor Buyouts—and the substance of the claims—which seek to enjoin and undo the very Investor Buyouts that the operating agreements authorized—are consistent with a coordinated effort by Maude and his agents to obstruct and undo the lawful exercise of Plaintiffs' contractual rights.

107. Upon information and belief, the Barry Lawsuit is the direct and proximate result of Maude's campaign of interference, misrepresentation, and Confidential Info use, and disclosure conducted through himself and his agents. But for Maude's misconduct, the Barry Lawsuit would not have been filed.

108. In addition to orchestrating the Barry Lawsuit through himself and his agents, Maude is directly advancing his scheme to obstruct and undo the Investor Buyouts through his role as manager of certain plaintiff entities in the Barry Lawsuit. Specifically, Maude serves as the manager of Lincoln Real Estate Investors LLC, Heathrow Investors LLC, and Heathrow Wichita LLC, three of the named plaintiffs in the Barry Lawsuit. In his capacity as manager of these entities, Maude is improperly using his position and authority to prosecute the Barry Lawsuit and to obstruct and undo the Investor Buyouts. Maude's use of his managerial authority over these entities to advance his personal campaign of interference against Plaintiffs constitutes a further breach of his confidentiality, contractual, legal and fiduciary obligations to Plaintiffs and demonstrates that the Barry Lawsuit is not a good-faith effort by aggrieved investors, but rather a

vehicle for Maude's ongoing scheme to benefit himself, to harm Plaintiffs and to obstruct and undo the lawful exercise of Plaintiffs' contractual rights.

109. The Barry Lawsuit complaint parrots the false narrative that Maude crafted and disseminated—namely, that investors were promised only a "portfolio sale" and that the individual buyout right was somehow waived or unenforceable. This narrative is lifted directly from Maude's playbook and was maliciously seeded into the investor community by Maude and his agents' unsolicited communications to investors and solicitation of investors to be named plaintiffs in the Barry Lawsuit.

110. Maude's conduct has caused and continues to cause substantial damages to Plaintiffs, including but not limited to: (a) legal fees and costs incurred in defending the Barry Lawsuit; (b) disruption of the Investor Buyouts; (c) harm to Collingsworth's relationships with investors cultivated over three decades; (d) harm to Plaintiffs' ability to raise capital in the future; (e) the cost of mitigation including forensic investigation and litigation necessitated by Maude's theft and interference; (f) delay and disruption of major property refinancing transactions, resulting in increased financing costs due to unfavorable interest rate movements, additional legal fees incurred in connection with lender communications, and other losses arising from the delayed closing of the refinancing; and (g) other losses, damages, forfeitures, disgorgements, restitutions; exemplary damages; statutory damages; attorneys' fees and costs, as well as other and further relief.

111. On August 10, 2026, Plaintiffs issued a written demand letter to Maude (the "Demand Letter") setting forth Maude's misconduct as alleged herein and demanding, among other things, that Maude: (a) return all Confidential Info, permanently delete and destroy all copies, and certify the same under oath; (b) affirm that he shall protect all attorney-client communications, work product, and

other privileged communications of the Collingsworth Parties; and (c) execute and return a retraction regarding his defamatory statements toward Breck Collingsworth and the other Collingsworth Parties.

112. Maude failed to comply with these demands, thereby requiring Plaintiffs to initiate this lawsuit to continue its investigation into Maude's misconduct, protect their interests in the Confidential Info, and remedy their damages that were caused by Maude.

**FIRST CAUSE OF ACTION - BREACH OF CONTRACT**

113. Plaintiffs incorporate the allegations of the foregoing paragraphs as if fully set forth herein.

114. Maude entered into approximately 44 RUAs with Plaintiffs.

115. The RUAs constitute valid, binding, and enforceable contracts between Plaintiffs and Maude.

116. Under the RUAs, Maude agreed not to disclose Confidential Info—including investor lists, financial models, valuations, and other proprietary business information—to any person or entity outside the company or to utilize such information for any purpose outside the scope of his employment.

117. Maude breached the confidentiality provisions of the RUAs by providing the investor list to third parties, and by directing third parties to contact and organize investors in opposition to the Investor Buyouts.

118. Maude breached the confidentiality provisions of the RUAs by, among other things: (a) transferring Confidential Info from company systems to his personal iCloud account prior to his departure, particularly during and after the October 2022 equity dispute; (b) on November 28, 2022, exporting Confidential Info to his personal Gmail account; (c) accessing Confidential Info during after-work hours to copy

and retain for himself the Confidential Info for personal use; (d) forwarding Confidential Info to his personal Gmail accounts and his wife's personal email account; (e) retaining Confidential Info after the termination of his employment, as evidenced by the continued synchronization of company files to his personal iCloud account after his departure; (f) using and disclosing the Confidential Info to third parties; and (g) utilizing Confidential Info for his personal benefit and/or for purposes adverse to Plaintiffs' interests, including to orchestrate investor opposition to the Investor Buyouts and the wrongful prosecution of the Barry Lawsuit.

119. Maude further breached the confidentiality provisions of the RUAs by utilizing Plaintiffs' Confidential Info to plan, prepare, and launch a competing business. Among other things, Maude: (a) as early as April 2021, began systematically copying Plaintiffs' Confidential Info to his personal iCloud storage for use in his competing venture; (b) while still employed by Plaintiffs in or about August 2022, pursued a competing retirement community acquisition using Plaintiffs' Confidential Info; (c) in or about November 2022, drafted formation documents for "Senior Retirement Resorts LLC" ("SR2") and "SR2 General Contracting LLC," entities designed to directly replicate Plaintiffs' vertically integrated business model contained in the Confidential Info; (d) in or about November 2022, filed Articles of Incorporation for "MateoCorp3 Inc.," a investment vehicle mimicking Plaintiffs' REI fundraising model contained in the Confidential Info; (e) in or about November 2022, copied Plaintiffs' complete Operations Manual—comprising thousands of confidential files including HR policies, accounting templates, and proprietary operational procedures contained in the Confidential Info —into his "SR^2" folder for use in his competing business; (f) after departure, used Plaintiffs' credit-package templates contained in the Confidential Info to create business documents for his competing "SR^2 Retirement Resort Prototype LLC" venture; and (g) in or about April 2023, edited financial models contained in the Confidential Info for his competing

business—including “New Retirement Community Model.xlsx” and “Prelim Analysis of RLC Offer.xlsx”—derived from Plaintiffs’ Confidential Info.

120. Maude breached the non-solicitation/non-compete provisions of the RUAs by offering, providing, permitting, and assisting in the offering of products and services similar to those provided by Plaintiffs to customers, clients, and prospective clients with whom Maude had personal contact during his employment. Specifically, Maude: (a) established Senior Retirement Resorts LLC, SR2 General Contracting LLC, and MateoCorp3 Inc.—entities designed to offer the same vertically integrated retirement community development, construction, and investment products as Plaintiffs; (b) used Plaintiffs’ proprietary credit-package templates, financial models, and operational procedures contained in the Confidential Info to develop competing retirement community projects; (c) created the “SR^2 Retirement Resort Prototype LLC” venture using Plaintiffs’ credit-package structure and source-and-use financial models contained in the Confidential Info; (d) designed MateoCorp3 Inc. as an investment vehicle mirroring Plaintiffs’ REI fundraising model contained in the Confidential Info, with the intent to solicit investment from Plaintiffs’ investor customers; and (e) maintained and operated these competing entities through at least January 2025, well within the restricted period.

121. Under the express terms of the RUAs, Maude’s breaches result in: (a) forfeiture of all Restricted Units held by Maude; and (b) the obligation to refund all compensation, benefits, and distributions previously received by Maude. These forfeiture and refund obligations inure to the benefit of the Company, Employer, and Retirement Community under each RUA—that is, to the benefit of the Plaintiffs and the Subject Entities.

122. As a direct and proximate result of Maude’s breaches of contract, Plaintiffs have suffered damages, including but not limited to the value of all Restricted Units, all compensation, benefits and

distributions paid to Maude, costs of mitigation and investigation and defense of the Barry Lawsuit, and interference with the Investor Buyouts, and the other damages and losses noted herein.

**SECOND CAUSE OF ACTION - BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

123. Plaintiffs incorporate the allegations of the foregoing paragraphs as if fully set forth herein.

124. Under Nebraska law, every contract contains an implied covenant of good faith and fair dealing, which obligates each party not to do anything that would have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

125. The RUAs and operating agreements to which Maude was a party impose on Maude an implied duty to act in good faith and not to undermine the legitimate contractual rights and expectations of Plaintiffs.

126. Maude breached the implied covenant of good faith and fair dealing by, among other things: (a) misappropriating Confidential Info to use as leverage against Plaintiffs, including transferring Confidential Info to his personal iCloud account immediately following the October 2022 equity dispute; (b) destroying Confidential Info to deprive Plaintiffs of evidence and business records, including deleting years of emails and clearing his browser history; (c) orchestrating an investor opposition campaign—utilizing third-party surrogates—designed to thwart the Investor Buyouts that Maude himself drafted; (d) using third-party intermediaries to circumvent the confidentiality provisions while achieving the same prohibited result; (e) providing false information and encouragement to investors to oppose a buyout mechanism that the investors agreed to at the time of their investment; (f) acting to destroy Plaintiffs' investor relationships and future fundraising capacity; and (g) facilitating the filing and prosecution of the Barry Lawsuit to obstruct and undo the lawful completion of the Investor Buyouts.

127. Maude further breached the implied covenant of good faith and fair dealing by attempting to circumvent the non-solicitation provisions of the RUAs through the use of third-party intermediaries. Specifically, Maude: (a) knew that direct contact with investors to solicit their opposition to the Investor Buyouts would constitute a blatant violation of the non-solicitation provisions; (b) deliberately used third parties as surrogates to do indirectly what he was expressly prohibited from doing directly under the RUAs; (c) provided Confidential Info to third parties with the specific intent that they would solicit, encourage, deceive and divert investors in opposition to Plaintiffs' contractual rights; and (d) coordinated the timing of the Barry Lawsuit filing to maximize interference with the Investor Buyouts while falsely claiming no involvement. Maude's use of intermediaries to accomplish indirectly what he was prohibited from doing directly constitutes a breach of the implied covenant of good faith and fair dealing inherent in the RUAs.

128. Maude further breached the implied covenant of good faith and fair dealing by planning, preparing, and taking steps to launch a competing business while still employed by Plaintiffs and while still receiving the benefits of the RUAs through, among other things, misappropriating Plaintiffs' Confidential Info for the specific purpose of creating competing businesses. The implied covenant obligates each party not to do anything that would have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. By stealing Plaintiffs' Confidential Info—including credit packages, financial models, construction documents, operational procedures, and investor data—while still receiving the benefits of the RUAs, Maude destroyed Plaintiffs' reasonable expectations that their Confidential Info would be preserved, protected and not used or disclosed for improper purposes. Maude's conduct in taking the Confidential Info and in preparing to compete while still employed and receiving RUA distributions constitutes a flagrant breach of the implied covenant.

129. As a direct and proximate result of Maude's breach of the implied covenant of good faith and fair dealing, Plaintiffs have suffered damages in an amount to be determined at trial.

**THIRD CAUSE OF ACTION - BREACH OF FIDUCIARY DUTY**

130. Plaintiffs incorporate the allegations of the foregoing paragraphs as if fully set forth herein.

131. As CFO and General Counsel of CGC and RLC, Maude occupied a position of trust and confidence and owed fiduciary duties of loyalty, care, and good faith to Plaintiffs.

132. Further, as a licensed attorney providing legal services to Plaintiffs in his capacity as General Counsel, Maude owed the heightened fiduciary duties attendant to the attorney-client relationship, including duties of loyalty, confidentiality, and the duty to refrain from using the Confidential Info for purposes adverse to the client's interests.

133. Maude breached his fiduciary duties by, among other things: (a) misappropriating Confidential Info belonging to Plaintiffs for his own use and for use adverse to Plaintiffs' interests, including by transferring large volumes of Confidential Info to his personal iCloud account, forwarding Confidential Info to personal Gmail accounts, and exporting Confidential Info; (b) destroying Confidential Info, including deleting thousands of emails containing contracts and property information; (c) using Confidential Info obtained during the course of his fiduciary relationship with Plaintiffs to organize investor opposition to Plaintiffs' lawful business and contractual activities, including by providing such Confidential Info to third-party surrogates; (d) disclosing Confidential Info including attorney-client privileged and confidential business information to third parties; (e) intentionally preventing Plaintiffs from developing direct relationships with investors to position himself as an indispensable intermediary; (f) acting in his own self-interest and against the interests of Plaintiffs while still subject to ongoing fiduciary obligations arising from his

equity holdings and the terms of the RUAs; and (g) facilitating the initiation and prosecution of the Barry Lawsuit to obstruct the Investor Buyouts.

134. Maude further breached his fiduciary duties by planning, preparing, and taking steps to launch a competing business while still serving as CFO and General Counsel of CGC and RLC, including, among other things: (a) while still occupying a position of trust with Plaintiffs, actively pursuing retirement community acquisitions for his personal benefit; (b) forming MateoCorp3 Inc. and drafting formation documents for Senior Retirement Resorts LLC and SR2 General Contracting LLC—entities designed to directly compete with and replicate Plaintiffs' business model—while still employed as a fiduciary; (c) copying Plaintiffs' complete Operations Manual containing nearly two decades of proprietary operational knowledge contained in the Confidential Info into personal storage for use in the competing venture; (d) using Plaintiffs' proprietary credit-package templates contained in the Confidential Info to create competing business documents; (e) continuing to build and operate Senior Retirement Resorts LLC after his departure; and (f) editing Plaintiffs' financial documents contained in the Confidential Info and storing them in his SR^2 competing business folder. Maude's conduct in planning, preparing, and taking steps to launch a competing business while employed as a fiduciary constituted a flagrant breach of his duties of loyalty, care, and good faith owed to Plaintiffs.

135. Maude's breaches of fiduciary duty were willful and deliberate. As a direct and proximate result of Maude's breaches of fiduciary duty, Plaintiffs have suffered damages in an amount to be determined at trial.

136. Plaintiffs are entitled to disgorgement and forfeiture of all Restricted Units and all compensation, benefits and distributions paid to Maude, costs of mitigation and investigation and defense of the

Barry Lawsuit, and interference with the Investor Buyouts, and the other damages and losses noted herein, along with equitable relief and pursuant to the express forfeiture provisions of the RUAs.

**FOURTH CAUSE OF ACTION - BREACH OF ATTORNEY-CLIENT DUTIES AND PRIVILEGE**

137. Plaintiffs incorporate the allegations of the foregoing paragraphs as if fully set forth herein.

138. At all relevant times, Maude was a licensed attorney and member of the Nebraska State Bar Association. From May 1, 2006, through December 31, 2022, Maude served as General Counsel for CGC and RLC, providing legal services to Plaintiffs in that capacity.

139. By virtue of his role as General Counsel, an attorney-client relationship existed between Maude and Plaintiffs. Maude owed Plaintiffs the duties imposed by the Nebraska Rules of Professional Conduct, including the duty of loyalty, the duty of confidentiality under Neb. Ct. R. of Prof. Cond. § 3-501.6, and the duties owed to former clients under Neb. Ct. R. of Prof. Cond. § 3-501.9.

140. Neb. Ct. R. of Prof. Cond. § 3-501.6 provides that a lawyer shall not reveal information relating to the representation of a client unless the client gives informed consent. This duty of confidentiality continues after the attorney-client relationship has terminated.

141. Neb. Ct. R. of Prof. Cond. § 3-501.9 provides that a lawyer who has formerly represented a client in a matter shall not thereafter use information relating to the representation to the disadvantage of the former client except as permitted or required by the Rules of Professional Conduct.

142. Maude breached his duties as Plaintiffs' attorney by, among other things: (a) disclosing Confidential Info obtained during his representation of Plaintiffs to third parties without Plaintiffs' consent; (b) using Confidential Info relating to his representation of

Plaintiffs for his personal benefit and/or to the disadvantage of Plaintiffs, including by providing Confidential Info to third parties to organize opposition to the Investor Buyouts; (c) misappropriating Confidential Info including attorney-client privileged communications and work product for his personal benefit and/or use adverse to Plaintiffs' interests; (d) failing to protect the Confidential Info obtained during his representation after the termination of the attorney-client relationship; and (e) using his knowledge of Confidential Info including Plaintiffs' legal and business affairs—gained through his role as General Counsel—to create businesses to compete with Plaintiffs, interfere with Plaintiffs' contractual rights and business relationships, and/or receive other personal benefits.

143. Maude further breached his duties as Plaintiffs' attorney by utilizing Confidential Info including attorney-client privileged materials obtained during his representation of Plaintiffs to plan, prepare, and operate a competing business and interfere with and harm Plaintiffs, including: (a) using his knowledge of Confidential Info including Plaintiffs' proprietary business model, operational procedures, and financial structures—gained through his role as General Counsel—to establish Senior Retirement Resorts LLC and related entities designed to compete directly with Plaintiffs; (b) using legal formation templates and organizational documents that he created or reviewed as Plaintiffs' General Counsel as the basis for his competing entity documentation; (c) using Confidential Info including confidential investor information and financial data obtained during his representation to prepare investor solicitation materials for his competing MateoCorp3 Inc. investment vehicle; and (d) using his intimate knowledge of Confidential Info including Plaintiffs' business operations and trade secrets, gained through sixteen years as General Counsel, to replicate Plaintiffs' vertically integrated business model for his own benefit and/or to interfere with and harm Plaintiffs.

144. Maude's breaches of his duties as Plaintiffs' attorney were willful and deliberate. Maude exploited the trust placed in him as their attorney to steal, use and disclose Confidential Info, which he then weaponized against Plaintiffs and/or for his personal benefit after his departure.

145. As a direct and proximate result of Maude's breaches of his duties as Plaintiffs' attorney, Plaintiffs have suffered damages as described herein.

**FIFTH CAUSE OF ACTION - VIOLATION OF THE NEBRASKA TRADE SECRETS ACT (NEB. REV. STAT. § 87-501 ET SEQ.)**

146. Plaintiffs incorporate the allegations of the foregoing paragraphs as if fully set forth herein.

147. Plaintiffs' Confidential Info including investor lists, financial models, projections, budgets, valuations, construction data, operational data, marketing strategies, and other proprietary business information constitute "trade secrets" within the meaning of Neb. Rev. Stat. § 87-502(4), as they: (a) derive independent economic value, actual or potential, from not being generally known to or readily ascertainable through proper means by other persons who can obtain economic value from their disclosure or use; and (b) are the subject of efforts by Plaintiffs that are reasonable under the circumstances to maintain their secrecy, including the non-disclosure and confidentiality provisions of the RUAs.

148. Maude "misappropriated" Plaintiffs' Confidential Info including trade secrets within the meaning of Neb. Rev. Stat. § 87-502 by, among other things: (a) acquiring the trade secrets through improper means, specifically by transferring company data to his personal iCloud account, forwarding company documents to personal Gmail accounts and his wife's email account, and retaining such data after the termination of his employment; (b) disclosing or using the trade secrets—including the investor list containing names, contact information, and investment details of investors—without Plaintiffs'

consent, by providing the investor list and other information to third parties for use in organizing opposition to Plaintiffs' lawful business activities and in prosecuting the Barry Lawsuit; and (c) acquiring the trade secrets through a relationship in which he had a duty to maintain their secrecy, and subsequently disclosing and using them without authorization and for purposes contrary to Plaintiffs' interests.

149. Maude's misappropriation of Plaintiffs' Confidential Info including trade secrets was undertaken for the specific purpose of establishing and operating a competing business that would directly replicate Plaintiffs' proprietary business model. Specifically, Maude: (a) misappropriated documents containing proprietary source-and-use financial models, loan term structures, and development economics—to use as the foundation for his competing SR^2 Retirement Resort Prototype LLC venture; (b) copied Plaintiffs' complete Operations Manual, containing proprietary job descriptions, HR policies, accounting templates, chart of accounts, sales and marketing procedures, and resident handbooks representing nearly two decades of accumulated operational knowledge; (c) used Plaintiffs' construction documents, development plans, and architectural materials to prepare competing development projects; (d) used Plaintiffs' financial statement formats, investor communication templates, and management contract structures for his competing entities; and (e) used Plaintiffs' proprietary PPM and operating agreement templates—which he drafted as General Counsel—as models for his competing MateoCorp3 Inc. investment vehicle.

150. Maude's misappropriation was willful and malicious. Maude deliberately accessed investor lists during after-work hours, exported his entire contact database to personal accounts, deleted evidence of his activities by deleting years of emails and documents, and subsequently used the Confidential Info to interfere with Plaintiffs' investor relationships, to obstruct and undo the Investor Buyouts, and to benefit himself.

151. Pursuant to Neb. Rev. Stat. § 87-503, Plaintiffs are entitled to injunctive relief to prevent actual or threatened misappropriation of their trade secrets.

152. Pursuant to Neb. Rev. Stat. § 87-504, Plaintiffs are entitled to damages for the actual loss caused by Maude's misappropriation and for unjust enrichment caused by the misappropriation that is not taken into account in computing actual loss.

## SIXTH CAUSE OF ACTION - VIOLATION OF THE DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836 ET SEQ.)

153. Plaintiffs incorporate the allegations of the foregoing paragraphs as if fully set forth herein.

154. Plaintiffs' Confidential Info, including, but not limited to, trade secrets—including investor lists, financial models, projections, budgets, valuations, construction data, operational data, marketing strategies, credit packages, source-and-use models, and other proprietary business information—are related to products and services used in interstate and foreign commerce.

155. Specifically, Plaintiffs' retirement community development, construction, and management businesses operate across multiple states, utilize interstate banking and financial services, engage vendors and contractors across state lines, solicit investors from multiple states, and conduct business through interstate communications and commerce.

156. Maude misappropriated Plaintiffs' Confidential Info including trade secrets within the meaning of 18 U.S.C. § 1839(5) by: (a) acquiring the trade secrets through improper means, specifically by transferring company data to his personal iCloud account, forwarding company documents to personal Gmail accounts and his wife's email account, exporting investor contact information, and retaining such data after the termination of his employment; (b) disclosing or using

the trade secrets—including the investor list containing names, contact information, and investment details of investors—without Plaintiffs' consent, by providing the investor list and other Confidential Info to third parties for use in organizing opposition to Plaintiffs' lawful business activities and in prosecuting the Barry Lawsuit; and (c) acquiring the trade secrets through a relationship in which he had a duty to maintain their secrecy, and subsequently disclosing and using them without authorization and for purposes contrary to Plaintiffs' interests.

157. Maude further misappropriated Plaintiffs' Confidential Info including trade secrets for the specific purpose of establishing and operating a competing business. Specifically, Maude: (a) misappropriated Plaintiffs' proprietary credit packages, source-and-use financial models, and development economics to use as the foundation for his competing SR^2 Retirement Resort Prototype LLC venture; (b) copied Plaintiffs' complete Operations Manual—containing proprietary job descriptions, HR policies, accounting templates, chart of accounts, sales and marketing procedures, and resident handbooks representing nearly two decades of accumulated operational knowledge—for use in his competing venture; (c) used Plaintiffs' construction documents, development plans, and architectural materials to prepare competing development projects; (d) used Plaintiffs' financial statement formats, investor communication templates, and management contract structures for his competing entities; and (e) used Plaintiffs' proprietary PPM and operating agreement templates as models for his competing MateoCorp3 Inc. investment vehicle.

158. Maude's misappropriation of Plaintiffs' Confidential Info including trade secrets was willful and malicious. Maude deliberately accessed investor lists during after-work hours, systematically exported confidential business information to personal accounts, deleted evidence of his activities by deleting years of emails and documents, and subsequently used the misappropriated information to interfere with Plaintiffs' investor relationships, obstruct the Investor Buyouts, and establish competing business enterprises.

159. As a direct and proximate result of Maude's misappropriation of Plaintiffs' Confidential Info including trade secrets in violation of the DTSA, Plaintiffs have suffered damages, including but not limited to: (a) the cost of forensic investigation to identify and assess the scope of the misappropriation; (b) the economic loss from the theft and misuse of Plaintiffs' Confidential Info; (c) the economic loss from the disclosure of the investor list to unauthorized third parties; (d) interference with the Investor Buyouts and damage to investor relationships; (e) the cost of defending the Barry Lawsuit, which was made possible by Maude's misappropriation; and (f) other damages to be proven at trial.

160. Pursuant to 18 U.S.C. § 1836(b)(3)(A), Plaintiffs are entitled to injunctive relief to prevent any actual or threatened misappropriation of their Confidential Info including trade secrets, including an order requiring Maude to return all trade secret information and to delete and destroy all copies thereof.

161. Pursuant to 18 U.S.C. § 1836(b)(3)(B), Plaintiffs are entitled to damages for: (i) actual loss caused by the misappropriation; (ii) any unjust enrichment caused by the misappropriation that is not addressed in computing actual loss; and (iii) in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the Maude's unauthorized disclosure or use of the trade secret.

Pursuant to 18 U.S.C. § 1836(b)(3)(C), because Maude's misappropriation was willful and malicious, Plaintiffs are entitled to exemplary damages in an amount not more than two (2) times the amount of damages awarded under 18 U.S.C. § 1836(b)(3)(B).

162. Pursuant to 18 U.S.C. § 1836(b)(3)(D), because Maude's misappropriation was willful and malicious, Plaintiffs are entitled to recover reasonable attorneys' fees incurred in prosecuting this cause of action.

## SEVENTH CAUSE OF ACTION - VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT (18 U.S.C. § 1030) (THE "CFAA")

163. Plaintiffs incorporate the allegations of the foregoing paragraphs as if fully set forth herein.

164. Plaintiffs' computer systems, network servers, email servers, and the P Drive constitute "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2) because they are used in and affecting interstate and foreign commerce and communication, including the use of the Internet, email, and cloud-based services to conduct business across state lines.

165. While employed by Plaintiffs, Maude was authorized to access Plaintiffs' protected computers solely for purposes of performing his job duties on behalf of Plaintiffs. Upon Maude's separation from employment on December 31, 2022, all authorization to access Plaintiffs' protected computers was supposed to be terminated.

166. In the period between Maude's announcement of his retirement and his departure on December 31, 2022, and continuing after his departure, Maude intentionally accessed Plaintiffs' protected computers—including his company-issued laptop, Plaintiffs' company network server, the P Drive, and Plaintiffs' email server—without authorization or in excess of his authorized access, in that he accessed such systems not for legitimate employment purposes, but for the purpose of stealing and destroying Plaintiffs' Confidential Info including proprietary information for his own personal benefit and to the detriment of Plaintiffs.

167. In violation of 18 U.S.C. § 1030(a)(2)(C), Maude intentionally accessed Plaintiffs' protected computers without authorization, or in excess of authorized access, and thereby obtained Confidential Info from such protected computers. Specifically, Maude: (a) transferred large amounts of Confidential Info including data from his company-issued laptop and from Plaintiffs' company server storage,

including the P Drive containing sensitive company data, to his personal iCloud account; (b) accessed and exfiltrated Confidential Info including confidential business documents related to land purchases, development, architecture, construction, operations, financial statements, marketing, and other proprietary information for each of Plaintiffs' retirement community projects; (c) accessed Confidential Info including confidential investor lists containing the names, contact information, and investment details of hundreds of investors to obtain this information for personal use; (d) exported Confidential Info including company contacts and investor information to his personal Gmail account; and (e) transferred and/or copied Confidential Info including emails and other confidential communications to personal Gmail accounts and to his wife's personal email account.

168. In violation of 18 U.S.C. § 1030(a)(4), Maude knowingly and with intent to defraud accessed Plaintiffs' protected computers without authorization, or in excess of authorized access, and by means of such conduct furthered the intended fraud and obtained things of value, including but not limited to: (a) Plaintiffs' Confidential Info including confidential investor list, which Maude subsequently provided to third parties to facilitate interference with Plaintiffs' investor relationships and the Investor Buyouts; (b) Confidential Info including proprietary business information that Maude intended to use to enter the retirement community business himself, as evidenced by his statement that he had "all the information" needed to do so; and (c) Confidential Info including confidential business records and trade secrets with substantial economic value.

169. The forensic audit confirms that Maude obtained Confidential Info from Plaintiffs' protected computers for the specific purpose of establishing and operating a competing business, to benefit himself and/or to harm Plaintiffs. Maude used the Confidential Info obtained through his unauthorized access to: (a) populate his "SR^2" folder with thousands of proprietary files, including Confidential Info necessary to replicate Plaintiffs' business model; (b) copy Plaintiffs' complete Operations Manual, which constitute Confidential Info, to

use as the operational foundation for his competing venture; (c) obtain Plaintiffs' credit-package templates, which constitute Confidential Info, for use in financing his competing projects; (d) access and copy construction documents, development plans, and financial models constituting Confidential Info for use in competing retirement community development; and (e) obtain investor redemption notifications and financial data constituting Confidential Info to inform his competing MateoCorp3 Inc. investment vehicle. Maude's formation of Senior Retirement Resorts LLC, SR2 General Contracting LLC, and MateoCorp3 Inc.—all designed to replicate components of Plaintiffs' vertically integrated business—confirms that his unauthorized access of Confidential Info was undertaken with the specific intent to defraud Plaintiffs by using their Confidential Info to compete against them, benefit himself and/or to harm Plaintiffs.

170. In further violation of the CFAA, Maude intentionally caused damage to Plaintiffs' protected computers by deleting large amounts of emails and data from his company-issued laptop and from Plaintiffs' email server, with the intent to deprive Plaintiffs of their Confidential Info including property and business records and to conceal evidence of his misconduct. Specifically, Maude deleted thousands of emails—which was contrary to the standard operating procedure of Plaintiffs' business. Many of these deleted emails contained Confidential Info including contracts, property information, and other core company records.

171. As a direct and proximate result of Maude's violations of the CFAA, Plaintiffs have suffered "loss" and "damage" within the meaning of 18 U.S.C. § 1030(e)(8) and (e)(11), including but not limited to: (a) the mitigation cost including the forensic audit to respond to the offense, conduct a damage assessment, and restore the data and systems to their condition prior to the offense; (b) the cost of remediation and enhanced security measures; (c) the cost of legal fees and litigation expenses; (d) the economic loss from the theft and misuse of Plaintiffs' Confidential Info, including the disclosure of the investor list to unauthorized third parties; and (e) the economic loss

from the destruction of Confidential Info, including years of deleted emails containing contracts, property information, and other core company records. The aggregate amount of such losses exceeds $5,000 in value in a one-year period, satisfying the jurisdictional threshold under 18 U.S.C. § 1030(c)(4)(A)(i)(I).

## EIGHTH CAUSE OF ACTION - CONVERSION

172. Plaintiffs incorporate the allegations of the foregoing paragraphs as if fully set forth herein.

173. Plaintiffs are the rightful owners of the Confidential Info including data, documents, emails, financial records, investor lists, and other information stored on Plaintiffs' computer systems, servers, and the P Drive.

174. Maude wrongfully exercised dominion and control over Plaintiffs' Confidential Info by: (a) transferring Confidential Info including company data and documents from Plaintiffs' systems to his personal iCloud account, personal Gmail accounts, and his wife's personal email account without authorization; (b) connecting multiple USB storage devices to his company computer to transfer Confidential Info; (c) retaining possession of and using Confidential Info after the termination of his employment, as evidenced by the continued synchronization of company files to his personal iCloud account even after his departure in January 2023; (d) deleting Confidential Info including company emails and documents from Plaintiffs' systems thereby depriving Plaintiffs of access to their own property; and (e) using Plaintiffs' Confidential Info including the investor list for his personal benefit and/or for purposes adverse to Plaintiffs' interests and without Plaintiffs' consent.

175. Maude's conversion of Plaintiffs' Confidential Info was undertaken for the specific purpose of establishing and operating a competing business, for his personal benefit, and/or to harm Plaintiffs. Maude wrongfully exercised dominion and control over Plaintiffs' Confidential Info by: (a) transferring thousands of proprietary files

constituting Confidential Info—including land purchase documents, development plans, construction documents, financial statements, marketing materials, and management contracts—into his personal "SR^2" folder for use in establishing Senior Retirement Resorts LLC; (b) copying Plaintiffs' complete Operations Manual, comprising thousands of files of proprietary operational procedures accumulated over nearly two decades and constituting Confidential Info, for use in his competing venture, for his personal benefit, and/or to harm Plaintiffs; (c) using Plaintiffs' credit-package templates, which constitute Confidential Info, as the basis for financing documents for his competing "SR^2 Retirement Resort Prototype LLC" project; (d) editing and adapting financial models constituting Confidential Info—including "New Retirement Community Model.xlsx" and "Prelim Analysis of RLC Offer.xlsx"—for use in his competing business, for his personal benefit, and/or to harm Plaintiffs; and (e) converting Plaintiffs' financial documents constituting Confidential Info for use in his competing business files.

176. Maude's actions constitute conversion of Plaintiffs' property under Nebraska law.

177. As a direct and proximate result of Maude's conversion, Plaintiffs have been deprived of the use and benefit of their Confidential Info and have suffered damages in an amount to be determined at trial.

## NINTH CAUSE OF ACTION - TORTIOUS INTERFERENCE WITH CONTRACTUAL RIGHTS

178. Plaintiffs incorporate the allegations of the foregoing paragraphs as if fully set forth herein.

179. At all relevant times, Plaintiffs had valid and existing contractual rights with investors in the Subject Entities. These contractual rights included: (a) the Operating Agreements governing each Subject Entity, which Maude himself drafted; (b) Section 10.7 (but Section 11.7 for Reflection Ridge Retirement Community LLC

("Reflection Ridge") and Section 10.9 for Maple Ridge) of the Operating Agreements, which expressly granted the Collingsworth Purchasers the right to purchase members' units at any time and for any reason at fair market value; (c) Section 10.8 (but Section 11.8 for Reflection Ridge and Section 10.10 for Maple Ridge) of the Operating Agreements, which established the appraisal process for determining fair market value; and (d) the Subscription Agreements executed by each investor, which bound each investor to the terms of the applicable Operating Agreement.

180. Maude had knowledge of Plaintiffs' contractual rights. As CFO and General Counsel for RLC and CGC from 2006 through 2022, Maude personally drafted every Operating Agreement and Subscription Agreement for all eleven (11) Subject Entities. Maude drafted Section 10.7 (Section 11.7 for Reflection Ridge and Section 10.9 for Maple Ridge) granting Collingsworth Purchasers the right to purchase members' units at fair market value. Maude drafted Section 10.8 (Section 11.8 for Reflection Ridge and Section 10.10 for Maple Ridge) establishing the appraisal process. Maude was intimately familiar with every contractual provision because he created them.

181. Maude intentionally and improperly interfered with Plaintiffs' contractual rights by orchestrating a deliberate campaign to obstruct, delay, and derail the Investor Buyouts. Maude, among other things: (a) provided the Confidential Info to third parties for the purpose of organizing opposition to the Investor Buyouts; (b) directed and encouraged third parties to contact investors and solicit appraisal contests to delay the buyout process; (c) coordinated with third parties to file the Barry Lawsuit on July 9, 2026, one day before the scheduled closing of the Investor Buyouts, seeking to enjoin and void the lawful exercise of Plaintiffs' contractual buyout rights; (d) organized investor opposition to the Investor Buyouts by disseminating false information that the buyout provision was "unfair, improper, or otherwise illegitimate"—when Maude himself drafted that very provision; (e) used surrogates to attempt to circumvent his confidentiality obligations while achieving the same prohibited result of interfering

with the buyout closings; and (f) improperly used his role as manager of Lincoln Real Estate Investors LLC, Heathrow Investors LLC, and Heathrow Wichita LLC to include those entities as plaintiffs in the Barry Lawsuit and advance his campaign of interference against Plaintiffs' contractual rights.

182. Maude's interference was improper and without justification. Maude had no legitimate business interest or legal right to interfere with Plaintiffs' exercise of their contractual buyout rights under the Operating Agreements.

183. As a direct and proximate result of Maude's interference, Plaintiffs' contractual rights were disrupted. The Barry Lawsuit was filed one day before the scheduled closing, seeking to enjoin and void the Investor Buyouts. Investors who had agreed to the buyout terms contested the appraisals under Maude's influence. The orderly closing process established by the Operating Agreements was obstructed and delayed.

184. As a direct and proximate result of Maude's tortious interference with Plaintiffs' contractual rights, Plaintiffs have suffered damages, including but not limited to: (a) legal fees and costs incurred in defending the Barry Lawsuit; (b) disruption and delay of the Investor Buyouts; (c) increased costs associated with the extended appraisal and closing process; (d) the cost of forensic investigation and litigation necessitated by Maude's interference; and (e) delay and disruption of a major property refinancing transaction, resulting in increased financing costs due to unfavorable interest rate movements, additional legal fees incurred in connection with lender communications, and other losses arising from the delayed closing of the refinancing.

## TENTH CAUSE OF ACTION - TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

185. Plaintiffs incorporate the allegations of the foregoing paragraphs as if fully set forth herein.

186. Plaintiffs had valid and existing business relationships and expectancies with their investors across the Subject Entity communities. These relationships included: (a) ongoing relationships with hundreds of investors who had invested capital in the Subject Entities over a period of approximately thirteen (13) years; (b) the reasonable expectancy of continued positive investor relations for future fundraising activities; (c) the reasonable expectancy of maintaining Collingsworth's reputation for integrity in the investment community; and (d) the reasonable expectancy of operating the Subject Entities and raising capital free from interference by former employees.

187. Maude had knowledge of Plaintiffs' business relationships and expectancies. As CFO and General Counsel for RLC and CGC from 2006 through 2022, Maude managed investor relationships and drafted every PPM and operating agreement. Maude was intimately familiar with every aspect of Plaintiffs' investor relationships, the investors' identities and contact information, and the importance of these relationships to Plaintiffs' ongoing business operations and future fundraising capacity.

188. Maude intentionally and improperly interfered with Plaintiffs' business relationships by making and disseminating false and defamatory statements to investors with the purpose and effect of tarnishing Plaintiffs' relationships with investors and other business relationships. Specifically, Maude: (a) made false oral statements to third-party investors claiming that Collingsworth committed fraud in connection with soliciting investors and exercising his contractual buyout rights; (b) stated—himself and/or through third parties—that Collingsworth promised investors he would never buy them out and that investors would remain in the Subject Entities until the retirement communities were bundled into portfolios and sold to private equity groups; (c) falsely represented that Collingsworth's exercise of his contractual buyout rights constitutes fraud; (d) disseminated false statements through third parties that the buyout provision was "unfair, improper, or otherwise illegitimate"—when

Maude himself drafted that very provision and disclosed it to investors; (e) provided Confidential Info to third parties who then contacted investors to spread Maude's false narrative; and (f) coordinated with third parties to repeat and amplify his defamatory statements to the maximum number of investors.

189. Maude's statements were false. Collingsworth never promised investors that he would not exercise his contractual buyout rights. To the contrary, investors were expressly informed through the Private Placement Memoranda and the Operating Agreements—all of which were drafted by Maude—that Collingsworth and/or his entities retained the right to purchase investors' units at any time and for any reason at fair market value.

190. Maude's interference was improper and without justification. Maude had no legitimate business interest or legal right to make false statements to investors about Collingsworth or to tarnish Plaintiffs' business relationships.

191. Maude's interference caused harm to Plaintiffs' business relationships. As a direct result of Maude's false and defamatory statements, investors' trust in Collingsworth was undermined, investors opposed the Investor Buyouts based on false information, and Plaintiffs' longstanding investor relationships cultivated over three decades were damaged.

192. As a direct and proximate result of Maude's tortious interference with Plaintiffs' business relationships, Plaintiffs have suffered damages, including but not limited to: (a) irreparable harm to Collingsworth's relationships with investors cultivated over three decades; (b) harm to Plaintiffs' reputation in the investment community; (c) harm to Plaintiffs' ability to raise capital in the future; (d) damage to Plaintiffs' relationships with other business partners; and (e) loss of goodwill and investor trust.

## ELEVENTH CAUSE OF ACTION - UNJUST ENRICHMENT

193. Plaintiffs incorporate the allegations of the foregoing paragraphs as if fully set forth herein.

194. Maude received substantial benefits from Plaintiffs, including but not limited to: (a) distributions totaling over $20 million under the RUAs; (b) equity interests in approximately forty-four (44) retirement community entities; and (c) access to Plaintiffs' confidential and proprietary business information, investor relationships, and goodwill.

195. Maude's receipt and retention of these benefits is inequitable and unjust in light of his breaches of contract, fiduciary duty, and the law, including his misappropriation of Plaintiffs' Confidential Info, his orchestration of investor opposition to Plaintiffs' lawful business activities, and his theft and destruction of company data and records.

196. Under the circumstances, it would be unjust for Maude to retain the benefits he received from Plaintiffs, including all RUA distributions, equity interests, and the economic advantage gained through misappropriation of Plaintiffs' Confidential Info.

197. Plaintiffs are entitled to restitution and disgorgement of all benefits unjustly retained by Maude.

## TWELFTH CAUSE OF ACTION - SLANDER (DEFAMATION PER SE)

198. Plaintiffs incorporate the allegations of the foregoing paragraphs as if fully set forth herein.

199. Maude made false and defamatory oral statements of fact to third-party investors and others, claiming that Collingsworth committed fraud in connection with soliciting investors and the exercise of his contractual buyout rights under the operating agreements of the Subject Entities. Specifically, Maude—himself

and/or through his agents—falsely and fraudulently told investors that the Collingsworth Purchasers could only buy them out through a "portfolio sale" and that the buyout provision in the operating agreements was unfair, improper, or otherwise illegitimate. Those statements stand in direct contradiction to the language of the governing agreements, of which Maude had actual knowledge.

200. Maude's statements were false. None of the Plaintiffs ever made promises to investors, unless placed in writing and signed by all parties, as mandated by the governing agreements (i.e., the PPMs, the Subscription and Operating Agreements of the Subject Entities). Those express disclosures and the rights to exercise Investor Buyouts were never amended, modified, or cancelled.

201. Upon information and belief, Maude also made oral defamatory statements to investors, falsely claiming that Collingsworth is committing fraud in soliciting investors and by the Collingsworth Purchasers exercising their buyout rights under the applicable operating agreements. Specifically, Maude falsely and fraudulently represented to investors—himself and/or through his agents—that Collingsworth promised investors he would never buy them out and that they would remain as investors in the Subject Entities until the retirement communities were bundled into portfolios and sold to private equity groups.

202. Maude's statements were defamatory per se under Nebraska law because they accused Collingsworth of committing fraud—a crime involving moral turpitude—and because they tend to injure Collingsworth in his trade, business, and profession by imputing dishonesty and fraudulent conduct in the operation of his businesses.

203. Maude published defamatory statements to third parties, including investors in the Subject Entities and others.

204. Maude's statements were made without privilege. Maude had no legitimate interest in making the statements, and the statements were not made in any context protected by qualified or absolute privilege.

205. Maude made the defamatory statements with actual malice—that is, with knowledge that the statements were false or with reckless disregard for their truth or falsity. Maude knew that Collingsworth never promised investors that he would not exercise his buyout rights because Maude himself drafted the PPMs and operating agreements that expressly disclosed those rights. Maude's statements were made with the intent to harm Collingsworth's reputation and business relationships. In the alternative, Maude made the defamatory statements negligently, failing to exercise reasonable care to determine their truth or falsity before publishing them to third parties.

206. As a direct and proximate result of Maude's slander, Plaintiffs have suffered damages, including but not limited to: (a) harm to Plaintiffs' reputation among investors and in the business community; (b) damage to Plaintiffs' business relationships with investors cultivated over three decades; and (c) interference with Plaintiffs' ability to conduct business and raise capital. Because Maude's statements are defamatory per se, Plaintiffs are entitled to presumed damages without proof of actual pecuniary loss.

## THIRTEENTH CAUSE OF ACTION - DECLARATORY JUDGMENT

207. Plaintiffs incorporate the allegations of the foregoing paragraphs as if fully set forth herein.

208. Pursuant to the Nebraska Uniform Declaratory Judgments Act, Neb. Rev. Stat. § 25-21,149 et seq., an actual controversy exists between Plaintiffs and Maude regarding Maude's rights, if any, under the RUAs and his status as a unit holder in the Subject Entities.

209. The RUAs contain express forfeiture provisions providing that, upon breach of the confidentiality, non-compete, or non-solicitation provisions, all Restricted Units held by Maude are automatically forfeited and Maude is obligated to refund and deliver all benefits, payments, dividends, and distributions previously received.

210. As alleged herein, Maude breached the confidentiality, non-compete, and non-solicitation provisions of the RUAs by, among other things: (a) misappropriating and disclosing Confidential Info; (b) using Confidential Info to plan, prepare, and launch competing businesses; (c) disclosing the investor list to third parties; and (d) soliciting and organizing investor opposition to the Investor Buyouts through third-party intermediaries.

211. As a result of Maude's breaches, the forfeiture provisions of the RUAs have been triggered, and Maude has forfeited all rights to any Restricted Units, distributions, or other benefits under the RUAs.

212. Plaintiffs have no adequate remedy at law absent specific performance of Maude's obligations in the RUAs, including without limitation the forfeiture provisions of the RUAs.

213. This Court should enforce the RUAs and order the parties to specifically perform the transaction on the terms set forth in the Agreement.

214. Plaintiffs seek a declaratory judgment that: (a) all Restricted Units held by Maude under the approximately forty-four (44) RUAs are hereby forfeited; (b) Maude is no longer an owner, member, or unit holder in any of the Subject Entities or any other entity in which he held Restricted Units under the RUAs; (c) all Restricted Units previously awarded to Maude are hereby assigned and deemed delivered to the Entity which awarded them under the applicable RUA free and clear of any rights, claims or interests of any

other person or entity; and (d) Maude has no further right, title, or interest in or to any Restricted Units, equity interests, or ownership rights in any of the Subject Entities or other entities covered by the RUAs.

215. Plaintiffs further seek a declaratory judgment that: (a) Maude has forfeited all distributions previously paid to him under the RUAs; (b) Maude is not entitled to any future distributions, dividends, payments, or other benefits under the RUAs or from any of the Subject Entities or other entities covered by the RUAs; and (c) Plaintiffs are entitled to recover from Maude all distributions, dividends, and payments previously made to him free and clear of any rights, claims or interests of any other person or entity together with pre-judgment interest thereon

216. Plaintiffs further seek a declaratory judgment that Maude is obligated to refund all wages, salary, and compensation paid to him during and after the period of his breach of fiduciary duties to Plaintiffs, together with pre-judgment interest thereon. As CFO and General Counsel of CGC and RLC, Maude owed fiduciary duties of loyalty, care, and good faith to Plaintiffs. Maude breached those fiduciary duties by, among other things, misappropriating Confidential Info, planning, and preparing competing businesses while still employed, and acting in his own self-interest to the detriment of Plaintiffs. Under Nebraska law, a fiduciary who breaches his duties forfeits his right to compensation for services rendered during the period of disloyalty. Accordingly, Maude is obligated to return to CGC and RLC all wages, salary, and compensation paid to him during the period of his breach of fiduciary duties, together with interest thereon.

217. Plaintiffs further seek a declaratory judgment for such other statements as may be necessary to resolve the disputes consistent with the declarations requested or to be requested by Plaintiffs.

218. A declaratory judgment is necessary and appropriate to resolve the actual controversy between the parties regarding: (a) Maude's status as a unit holder in the Subject Entities; (b) the legal effect of Maude's breaches on his rights under the RUAs; (c) Plaintiffs' entitlement to recover all distributions previously paid to Maude; and (d) Maude's obligation to refund wages and compensation received during and after his breach of fiduciary duties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Breck C. Collingsworth, Cameron General Contractors, Inc., Resort Lifestyle Communities, Inc., Collingsworth Management LLC, The Breck and Tracy Collingsworth Family, LLC, and The Breck and Tracy Collingsworth Family II, LLC, respectfully pray that this Court enters judgment in their favor and against Defendant Matthew M. Maude as follows:

A. Awarding Plaintiffs damages as follows:

a. Damages in an amount to be determined at trial, including but not limited to:

i. All distributions and payments made to Maude under the RUAs, which are in excess of $20,000,000.00;

ii. All compensation paid and the value of benefits provided to Maude during and after the period he was violating his fiduciary duties to Plaintiffs;

iii. Damages to Plaintiffs' business relationships and contractual rights;

iv. Damages to Plaintiffs' fundraising and income producing capacities;

v. The increased expenses, costs, damages and losses resulting from Maude's interference with the Investor Buyouts;

vi. The attorney fees and costs incurred in defending the Barry Lawsuit and any compelled arbitration related thereto;

vii. The increased expenses, costs, damages and losses resulting from delay and disruption of property refinancing transactions, including increased financing costs, rate lock losses, and related legal and professional fees;

viii. The costs incurred by Plaintiffs to attempt to mitigate their damages, losses and increased expenses, costs, damages and losses;

ix. The cost of forensic investigations to identify and assess the scope of Maude's misconduct and misappropriation;

x. Damages and losses caused by Maude's misappropriation of Plaintiffs' Confidential Info and other misconduct;

xi. Damages from Maude's unjust enrichment and from the economic advantages Maude, the entities he owns and manages, and those acting on his benefit or directive, gained through his misconduct and misappropriation;

xii. Damages for conversion of Plaintiffs' property;

xiii. Damages for the harm to Plaintiffs' reputation;

xiv. Exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C), in an amount not more than two (2) times the amount of damages awarded under 18 U.S.C. § 1836(b)(3)(B), because Maude's misappropriation of Plaintiffs' Confidential Info was willful and malicious; and

xv. Presumed and actual damages for defamation per se; and

xvi. Other statutory, legal and contractual damages to be proven at trial;

B. Ordering Maude (i) to forfeit all Restricted Units held by Maude under all approximately forty-four (44) RUAs; and (ii) to disgorge, refund and deliver all compensation, the value of benefits provided, payments and distributions Maude received under the RUAs and/or in his role as a fiduciary for Plaintiffs, as expressly provided by the forfeiture provisions of the RUAs and by Nebraska fiduciary law;

C. Entering a declaratory judgment that: (i) all Restricted Units held by Maude under the approximately forty-four (44) RUAs are hereby forfeited, and thus Maude is no longer an owner, member, or unit holder in any of the Subject Entities or any other entity in which he held Restricted Units under the RUAs; (ii) all Restricted Units previously conditionally awarded to Maude together with any equity interest or ownership right in any of the Subject Entities or other entities covered by the RUAs, are deemed assigned and delivered to the Entity which awarded them under the applicable RUA, free and clear of any rights, claims, titles or interests of Maude or any other person or entity; and (iii) Maude is not entitled to any future distributions, payments, or other compensation or benefits under the RUAs or from any of the Subject Entities or other entities covered by the RUAs, together with pre-judgment interest thereon;

D. Granting temporary and permanent injunctive relief enjoining Maude, the entities he owns and manages, and those acting on his benefit or directive: (i) from further disclosing, using, or disseminating Plaintiffs' Confidential Info; (ii) from further contacting or soliciting Plaintiffs' investors, directly or through intermediaries; (iii) from

any actual or threatened misappropriation of Plaintiffs' Confidential Info (i.e., trade secrets) pursuant to 18 U.S.C. § 1836(b)(3)(A); (iv) from any actual or threatened misappropriation of Plaintiffs' Confidential Info (i.e., trade secrets) pursuant to Neb. Rev. Stat. § 87-503; enjoining Maude; and (v) from disclosing or using the attorney-client communications, work product, and other privileged or protected information of Plaintiffs, the various retirement community entities, and their affiliates;

E. Granting temporary and permanent injunctive relief requiring Maude, the entities he owns and manages, and those acting on his benefit or directive: (i) to return all Plaintiffs' Confidential Info including company data, documents, and information in their possession, custody, or control; (ii) to permanently delete and destroy all copies or summaries of Plaintiffs' Confidential Info and certify the same under oath; (iii) to identify in writing and under oath all persons and entities to whom he disclosed Plaintiffs' Confidential Info; and (iv) to affirm in writing and under oath that he shall protect and preserve all attorney-client communications, work product, and other privileged or protected information of Plaintiffs, the various retirement community entities, and their affiliates;

F. Awarding Plaintiffs the reasonable attorneys' fees and costs incurred by them in obtaining this judgment, including pursuant to 18 U.S.C. § 1836(b)(3)(D) because Maude's misappropriation Plaintiffs' Confidential Info was willful and malicious, and as otherwise allowed by law;

G. Awarding Plaintiffs pre-judgment and post-judgment interest at the maximum rate allowed by law or contract; and

H. Awarding Plaintiffs such other and further relief as the Court deems just and equitable.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury of all issues so triable raised herein.

Dated: August 25, 2026.

BRECK C. COLLINGSWORTH; CAMERON GENERAL CONTRACTORS, INC.; RESORT LIFESTYLE COMMUNITIES, INC.; COLLINGSWORTH MANAGEMENT LLC; THE BRECK AND TRACY COLLINGSWORTH FAMILY, LLC Plaintiffs; and THE BRECK AND TRACY COLLINGSWORTH FAMILY II, LLC,

BY: */s/Gregory C. Scaglione*

Gregory C. Scaglione, #19368
Trevor J Lee, #27063
KOLEY JESSEN P.C., L.L.O.
One Pacific Place, Suite 800
1125 South 103rd Street
Omaha, NE 68124-1079
(402) 390-9500
(402) 390-9005 (facsimile)
Greg.Scaglione@koleyjessen.com
Trevor.Lee@koleyjessen.com

*Attorneys for Plaintiffs.*

Filed in Lancaster District Court
*** EFILED ***
Case Number: D02CI260003232
Transaction ID: 0025521978
Filing Date: 08/31/2026 04:34:16 PM CDT

**IN THE DISTRICT COURT OF LANCASTER COUNTY, NE**

BRECK C. COLLINGSWORTH; CAMERON GENERAL CONTRACTORS, INC.; RESORT LIFESTYLE COMMUNITIES, INC.; COLLINGSWORTH MANAGEMENT LLC; THE BRECK AND TRACY COLLINGSWORTH FAMILY, LLC; and THE BRECK AND TRACY COLLINGSWORTH FAMILY II, LLC,

Plaintiffs,

v.

MATTHEW M. MAUDE, individually,

Defendant.

Case No. CI 26-3232

**VOLUNTARY APPEARANCE AND STIPULATION ON RESPONSIVE PLEADING DEADLINE**

COMES NOW Defendant Matthew M. Maude ("Defendant"), and hereby voluntarily enters his appearance in the above-captioned lawsuit and states he has voluntarily accepted service of process on August 31, 2026.

Counsel for Defendant has conferred with counsel for Plaintiffs, and the Parties stipulate and agree that the deadline for Defendant's responsive pleading shall be extended to and including October 2, 2026.

DATED this 31st day of August 2026.

MATTHEW M. MAUDE, Defendant.

By: *<u>/s/ Marnie A. Jensen</u>*
Marnie A. Jensen (NE #22380)
Kamron T.M. Hasan (NE #25494)
Alexa B. Barton (NE #27010)

Kevin S. Grossaint (NE #28134)
HUSCH BLACKWELL LLP
14606 Branch Street, Suite 200
Omaha, NE 68154
Telephone: (402) 964-5000
Fax: (402) 964-5050
Marnie.Jensen@huschblackwell.com
Kamron.Hasan@huschblackwell.com
Allee.Barton@huschblackwell.com
Kevin.Grossaint@huschblackwell.com
*Attorneys for Defendant Matthew M. Maude*

# Certificate of Service

I hereby certify that on Tuesday, September 01, 2026 I provided a true and correct copy of the Voluntary Appearance to the following:

Cameron General Contractors, Inc. represented by Scaglione,Greg, (Bar Number: 19368) service method: Electronic Service to greg.scaglione@koleyjessen.com

Breck&Tracy Collingsworth Family represented by Scaglione,Greg, (Bar Number: 19368) service method: Electronic Service to greg.scaglione@koleyjessen.com

Breck&Tracy Collingsworth Family II represented by Scaglione,Greg, (Bar Number: 19368) service method: Electronic Service to greg.scaglione@koleyjessen.com

Collingsworth,Breck,C represented by Scaglione,Greg, (Bar Number: 19368) service method: Electronic Service to greg.scaglione@koleyjessen.com

Resort Lifestyle Communities, Inc. represented by Scaglione,Greg, (Bar Number: 19368) service method: Electronic Service to greg.scaglione@koleyjessen.com

Collingsworth Management LLC represented by Scaglione,Greg, (Bar Number: 19368) service method: Electronic Service to greg.scaglione@koleyjessen.com

Signature: /s/ Marnie Jensen (Bar Number: 22380)